[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff appeal from the assessment of damages made by the defendant for the taking of two portions of its property in the Town of Windsor as shown on a map entitled: "TOWN OF WINDSOR MAP SHOWING LAND ACQUIRED FROM POQUONOCK AVENUE ASSOCIATES BY THE STATE OF CONNECTICUT INTERSTATE ROUTE 91 (LIMITED ACCESS HIGHWAY) SCALE 1"=40' MAY 1985 ROBERT W. GUBALA TRANSPORTATION CHIEF ENGINEER — BUREAU OF HIGHWAYS." A copy of the map was received into evidence in three sheets marked Exhibit B-1, B-2 and B-3. The property taken was also described in the complaint and consists of two parcels described as Parcel No. 1 and Parcel No. 2. Parcel No. 1 contains 1.70 acres, more or less, and is bounded southeasterly by I-91. Parcel No. 2 contains 1.40 acres, more or less, and is bounded northeasterly by Kennedy Road and southeasterly by I-91. Also taken were the following rights: rights of access to and from a portion of Kennedy Road as it existed were terminated; a right to grade and remove, use or retain excavated material within an area of 0.04 of an acre, more or less, said right to terminate upon completion of the work.
The plaintiff's property lies in the northerly part of the Town of Windsor with its northeast corner at the intersection of I-91 and Kennedy Road. Windsor is in the Greater Hartford Region and is 31.2 square miles in area. Its principal industries are tobacco growing, manufacturing and machine shops. It is close to many major insurance company home offices and defense industries. There has been planned development along the major highways which has attracted industrial and corporate office parks. Windsor also has large industrial areas, and its population is about 28,000. The subject property is located at Exit 39 of I-91 and is in a mixed use area. The I-91 corridor has seen rapid commercial, industrial and hospitality development. Kennedy Road is a secondary highway along which there has also been commercial and industrial development. Across Kennedy Road to the north of the subject property are found a Travelers Insurance Company warehouse, a Pepsi-Cola distribution facility and a Shell gas station. Adjacent to the subject property is the Chateau Woods development, a mix of apartments and town houses. A short distance to the west of the CT Page 10212 subject property is the Farmington River, and residential communities have been developed along River Road. There is a
The subject property which was made up of several parcels was acquired by the plaintiff from Windsor Plaza Associates in 1975. Two of the parcels making up the subject property are Plaza, Inc. and received in 1971 by the Windsor Planning Department gave the total area of the subject property as 124.3 acres. The Site Master Plan was received into evidence and marked Exhibit C. The reports of the appraisers, Exhibits R and S, give the total acreage from the assessor's records as about 104.6 acres. An agreement received in evidence as Exhibit H which permits construction of 150 units gives the acreage as approximately 125 acres.
The Windsor Zoning Regulations were amended in 1968 to provide for Planned Urban Development zones (PUD), a zone classification which was to be urban in character and contain combined business and residential uses. Zone changes were granted and the subject property was assembled and in 1971 the was the only property zoned PUD in Windsor. It was served by all utilities.
Parcel A of the subject property consisted of approximately 54.17 acres before the taking. Parcel B consisted of approximately 19.9 acres before the taking. Parcel A was an irregularly shaped parcel having a frontage of 1,340 feet, more or less, on Kennedy Road. It had a non-access boundary along the easterly side of I-91. It was divided by High Path Road, a private road providing access to the Chateau Woods condominium complex. It was burdened by easements in favor of HELCO, the MDC and CLP. It was partly cleared and partly wooded and was substantially level. Parcel B was an irregularly shaped parcel lying southerly of the Chateau Woods complex. It was burdened by easements in favor of HELCO and MDC. The MDC easement contains an 8 inch main leading from the Chateau Woods complex to a pump station from which a storm sewer drains water from the Chateau Woods complex. There is also an easement providing access to property of abutting landowners. Maps on record show a proposed extension of High Path Road providing access to Parcel D. The terrain is rolling and is wooded for the most part.
Although the PUD regulation has been amended, there is an approved plan of development for the subject property which was granted at a time when the density permitted was up to 12 dwelling units per acre rather than the 4 units per acre presently permitted. Windsor Plaza, predecessor in title, submitted a proposed plan of development which was approved by the Planning and Zoning Commission. Under the plan, Parcel A was to be developed with a large shopping CT Page 10213 mall, two bank buildings and a gasoline station. There was provision for ample parking and for the addition of future stores. The remainder of the subject property, including Parcel D, was to be developed with apartment buildings, townhouses, condominium units and recreational space. Parcel D was to have 140 townhouse/condominium units.
The plaintiff's predecessor began development in accordance with the plan. Permission was obtained to construct 150 rental units before the shopping mall was begun and these were constructed substantially in conformity with the plan. It was still not economically feasible to construct the shopping mall, and permission was obtained in August, 1972, to construct another 100 residential units immediately followed by an additional 100 units when construction of the shopping mall had commenced. Of the first additional 100 units, 98 have been built. Underground utilities have been constructed which extend into Parcel D. None of the residential units proposed for Parcel D have been built, nor has any building been commenced on Parcel A.
The property taken from Parcel A, the 54.17 acre piece fronting on Kennedy Road, was designated in the complaint as Parcel No. 2. It consists of an irregular strip of land along I-91 and Kennedy Road containing 1.4 acres, more or less. Right of access along the first 194 feet of Kennedy Road, the portion nearest to I-91, will be denied. The property taken from Parcel D was designated in the complaint as Parcel No. 1. It consists of an irregular strip of land along I-91 containing 1.7 acres, more or less.
After the take, Parcel A contained 52.77 acres, more or less. It had 1,250 feet, more or less, of frontage on Kennedy Road. Of this frontage, 194 feed became non-access. A temporary right to grade and remove, use or retain excavated material within an area of 0.04 of an acre, more or less, was also taken. After the take, Parcel D contained 18.2 acres, more or less.
Roy L. O'Neil, Jr., an appraiser retained by the plaintiff, testified an an expert witness. He opined that the highest and best use to which the subject property can be put is as a Planned Urban Development as proposed and approved, with a commercial development on Parcel A and multifamily residential units on Parcel D. He used the direct sales comparison or market data approach to value. There was no other PUD zone in Windsor, but he identified a number of sales of land zoned for commercial use. O'Neil analyzed six sales of land, some of which were zoned for business use and some for industrial use, which he felt were comparable to Parcel A. Using these sales CT Page 10214 and adjusting them for various factors, he opined that Parcel A had a value of $130,000 per acre both before and after take. He computed the fair market value before the take at $7,040,000 and after the take at $6,860,000. He estimated damages for the take from Parcel A at $180,000. O'Neil identified several condominium sales and analyzed two sales of multi-family sites which he felt were comparable to Parcel D. He estimated the land value of Parcel D using an estimated value of $20,000 per unit for the 140 units which had been approved. This produced a value of $2,800,000 for 19.9 acres, or $140,700 per acre. Using this per acre figure, he computed the value of the 18.2 acres remaining after the take at $2,560,000. Direct damages for the take were thus $240,000. O'Neil considered that 35 of the townhouses approved on the plan of development were within the required 50 foot rear yard line and that 17 additional units might be within 150 feet of the widened highway and thus in violation of zoning regulations. He opined that it might be possible to save some of these 52 units by re-designing the plan, but that it would be necessary to obtain zoning approval which might not be forthcoming. He multiplied the estimated land value of $20,000 per unit by the 88 remaining units to arrive at a fair market value for the remaining land of $1,760,000. Subtracting $1,760,000 from the total value of $2,800,000 he was left with total damages of $1,040,000 for Parcel D. Since he had estimated damages for the taken land at $240,000, O'Neil opined that severance damages for Parcel D were $800,000. His estimate of total damages arising from the take was $1,220,000.
John F. DeLucco, also a qualified appraiser, testified as an expert witness for the defendant. DeLucco opined that the highest and best use of the subject property was a Planned Urban Development as permitted under the PUD zone. Parcel A was to be improved with a shopping plaza and various commercial buildings and Parcel D was a proposed site for condominium development. He used the market data approach to value. He identified three sales from which he obtained a value. He identified three sales from which he obtained a value range for Parcel A and three sales from which he obtained a value range for Parcel D. He estimated that before the take, Parcel A had a value of $77,800 per acre which produced a value of $4,215,000 for the 54.17 acres. He estimated that before the take, Parcel D had a value of $21,900 per acre which produced a value of $435,000 for the 19.9 acres. He opined that after the take, the proposed use as a shopping center for Parcel A would be minimally affected and that its highest and best use was unchanged, subject to approval by the Town of Windsor. He opined that the proposed use of Parcel D as a condominium site remained unchanged, with minimal effect from the taking and also subject to approval by the Town of Windsor. He used the same sales as he had used in estimating CT Page 10215 value before the take as indicators of value. He opined that the value of Parcel A after the take was $4,100,000 and that the value of Parcel D after the take was $400,000. He estimated damages for Parcel A to be $115,000 and damages for Parcel D to be $35,000. His estimate of total damages arising from the take was $150,000. It was DeLucco's opinion that there were no severance damages. Both parcels were vacant and his testimony was that he found no plans on record in the Building Department for the construction of anything on either parcel.
DeLucco conceded that he had not known of the plan of development, that he valued the property as raw land, that he might not have come to the same conclusion had he known of the plan of development and might have included the effect of the take on development had he known of it.
The highest and best use of the subject property is as a Planned Urban Development. The PUD zone is a unique zone, a the subject property is the only property in Windsor which carries this designation. The intent of the PUD regulation is to establish a zone which is urban in character and combines business and residential uses. It is a part of the intent as expressed in the regulations to permit and require the development of PUD sites in regulated stages to insure that the proper and desired urban character will evolve in an orderly and proper manner. The first stage of development requires a department store of at least two stories with not less than 80,000 feet of retail space area. See Exhibits D and E. By agreement reached between the plaintiff and the Windsor zoning authorities, the plaintiff was given permission to build first 150 and then an additional 100 residential units before commencing construction of a department store or office plaza on Parcel A. The requirement that construction on the commercial phase commence before any additional residential construction is begun remains in effect. It has never been economically feasible to construct the commercial phase of the project.
The plaintiff does not claim severance damages with respect to Parcel A. With respect to Parcel D, there is a claim that the effect of the taking is to reduce the number of approved units by 52, the number which might lie within the 150 foot setback from I-91, a limited access highway. The highway construction plans show that the actual number of units affected is 35. It is possible to re-design the plan for Parcel D to save some of the 35 units lost and, indeed, the defendant offered a conceptual plan which saved all but 12 of the units. Any such change would require an application to the Windsor zoning authority. Approval of such a plan must remain a matter for speculation, particularly in light of the fact that the density of the approved plan is a little over 7 units per acre CT Page 10216 while the density requirement in the PUD regulations as amended is now 4 units per acre. The plaintiff will be able to build additional residential units once it commences construction on Parcel A. That will not occur until the plaintiff determines that it is economically feasible to do so. Whenever it does occur, the plaintiff will have lost 35 of the 140 units planned for Parcel D because of the taking.
The duty of a referee sitting as a court on appeals in condemnation matters has often been stated. He is not simply trier of fact or an arbiter of differing opinions of witnesses. He is charged with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. Ultimately, the referee's determination of the value of property depends upon his considered judgment, taking into consideration the divergent opinions of the witnesses and the claims of the parties. He may reach his own conclusion as to value by weighing the opinions of the appraisers and other witnesses, the claims of the parties, all of the circumstances in evidence bearing on value, and his own general knowledge of the elements affecting value, selecting the most appropriate method of valuation under the facts bound by him.
Having seen the subject property, and having given full consideration to all of the testimony and all of the evidence offered by the parties, and relying upon my own knowledge of the elements constituting value, I have concluded that the damages sustained by the plaintiff are $115,000 as to Parcel A and $282,000 as to Parcel D, a total of $397,000. Judgment may enter for the plaintiff for the further sum of $247,000 in addition to the sum of $150,000 which was deposited with the clerk of the court by the defendant and withdrawn by the plaintiff, with interest on such further sum from om the date of taking to the date of payment, together with an allowance towards the appraisal fee of $3,500.
GEORGE D. STOUGHTON, State Trial Referee